**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DAVID W. W. ADAMI and HEATHER L. GIGLIO, CO-ADMINISTRATORS of the ESTATE OF FREDERICK J. ADAMI, DECEASED., <br><br>       **Plaintiffs,**<br>    **vs.**<br><br>COUNTY OF BUCKS, BRIAN KIRCHER, PATRICK ROONEY, STEVEN COLUMBIA, C.O. KNONEBORG, LANGSTON MASON, TIMOTHY RICCI, DAVID GRESKO, PRIMECARE MEDICAL, INC., ET AL. <br><br>       **Defendants.** | **CIVIL ACTION**<br><br>**NO. 2:19-cv-02187-JS** |

**COUNTY DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS'**
**MOTION IN LIMINE FOR AN ADVERSE INFERENCE**

Defendants County of Bucks, Brian Kircher, Patrick Rooney, Steven Columbia, C.O. Knoneborg, Langston Mason, Timothy Ricci and David Gresko ("County Defendants"), by and through their counsel, submit this opposition to Plaintiffs' Motion in Limine for an Adverse Inference.

## BACKGROUND

Decedent, Frederick Adami, alleges a civil rights claim pursuant to 42 U.S.C. §1983 against the individual County Defendants and the County of Bucks, separately. Plaintiffs' Complaint arises out of Mr. Adami's death while he was housed at the Bucks County Correctional Facility, related in part to his opioid drug addiction and detox. Plaintiffs seek recovery of all available damages under the Wrongful Death Act of Pennsylvania and the Survival Act. *See* Pls.' Compl. ¶¶112 – 124.

Plaintiffs move for sanctions for the failure to preserve electronically stored information from two video surveillance cameras under the guise of a motion in limine. Plaintiffs' motion does not even address Rule 37(e), which governs spoliation motions and electronically stored information ("ESI"). In considering a motion for sanctions, the Court is required to conduct an extensive analysis, after proper motions and responses are filed, before any relief is granted or denied. *Martin v. Wetzel*, No. 1:18-CV-00215-RAL, 2020 WL 6948982, at *2 (W.D. Pa. Nov. 25, 2020) (digital video evidence qualifies as ESI); *Manning v. Safelite Fulfillment, Inc.,* No. CV 17-2824 (RMB/MJS), 2021 WL 3557582, at *4 (D.N.J. Apr. 29, 2021), report and recommendation adopted, No. 17-2824 (RMB/MJS), 2021 WL 3542808 (D.N.J. Aug. 11, 2021). For this reason alone, Plaintiffs' motion should be denied.

In addition to relying on outdated caselaw and ignoring the burdens imposed on Plaintiffs by Rule 37, Plaintiffs seek to impose sanctions against all County Defendants.[1] As the Individual Officers had no notice, or even the ability to preserve any electronically stored information, there is no basis for any motion seeking sanctions to be imposed against those Defendants. The imposition of any sanction would unduly prejudice the Individual Officers.

Finally, as will be detailed, there is no basis for the imposition of an adverse inference as to the County. The County took reasonable steps to preserve the video. But mechanical issues, and limitations in the capacity of the County's video and storage system, prevented the complete export of video from cameras two and five in Module A. Nevertheless, the County successfully preserved most of the video from the night of Mr. Adami's death. Accordingly, there is no

---

[1] For clarification purposes, the County of Bucks shall individually be referred to herein as the "County." The individual corrections officers named in the Complaint (Brian Kircher, Patrick Rooney, Steven Columbia, C.O. Knoneborg, Langston Mason, Timothy Ricci and David Gresko) shall be referred to herein as the "Individual Defendants."

prejudice to Plaintiffs' case. For these reasons and those that follow, Plaintiffs' motion for an adverse inference should be denied.

### A. Standard Applicable to a Motion Requesting an Adverse Inference.

Rule 37(e) provides a uniform standard governing motions seeking a spoliation sanction with respect to ESI and it provides the "exclusive remedy." *Bistrian v. Levi,* 448 F. Supp. 3d 454, 467 (E.D. Pa. 2020). Digital surveillance video qualifies as ESI and any request for the imposition of sanctions must, therefore, satisfy the requirements of Rule 37(e). *See id.*

Rule 37(e) provides that "spoliation occurs where ESI 'that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery.'" *Id.* at 465 (quoting Fed. R. Civ. P. 37(e)). Before any question of spoliation can be considered, "it is essential [to show] that the evidence in question [was] within the party's control." *See Mosaid Tech., Inc. v. Samsung Elec. Co.,* 348 F. Supp. 2d 332, 336 (D.N.J. 2004). The Court may consider what sanction to impose only if it finds that spoliation occurred. *Bistrian,* 448 F. Supp. 3d at 466.

The Court may only impose an adverse inference instruction if the moving party can prove that the responding party "acted with the intent to deprive another party of the information's use in the litigation." *Id.* Thus, only bad faith can give rise to an adverse inference charge. *See id.*

### B. Plaintiffs' Motion is Improper and Unfairly Prejudicial as it Relates to the Individual Officers.

There is no basis for the imposition of any sanctions as to the Individual Officers because it is undisputed that the Individual Officers were not on notice of any demand to preserve any ESI. *See* Pls.' Mtn. Ex. D (preservation letters to Warden Lagana and Director Pirolli).

Similarly, there is no argument or evidence that the Individual Officers had custody or control of the portions of the surveillance video at issue or that they had any ability to preserve said video. Thus, no sanctions are available or appropriate as to the Individual Officers. *See Mosaid Tech.,* 348 F. Supp. 2d at 336 ("[I]t is essential that the evidence in question be within the party's control.").

Consideration of an adverse inference as to the County must also be denied. As will be demonstrated below, Plaintiffs cannot establish spoliation or bad faith as to the County. Even if Plaintiffs could carry that burden, an adverse inference instruction would be prejudicial to the Individual Officers.

The only purpose of the introduction of the additional video surveillance would be to impeach, discredit, or perhaps credit the testimony of the Individual Officers. Plaintiffs posit that the missing video could have been relevant to the actions of the Individual Officers:

> including 1) evidence of conversations between corrections officer, a PrimeCare nurse, and Mr. Adami's cellmate, Bruce Gramiak when Mr. Gramiak told them that Mr. Adami was "really sick;" 2) Whether any corrections officer or inmate monitor went near enough to Mr. Adami's cell sufficiently to provide monitoring for his withdrawal; 3) Whether the overnight guards in the middle of the night were responding to Mr. Adami's cell when they walked towards the area of Mr. Adami's cell.

Pls.' Br. at 7 of 10. Plaintiffs speculate that the unavailable video would provide additional details about the movements of the prison employees during the overnight hours.

As Plaintiffs' acknowledge, other video footage of Module A was preserved, available, and produced in discovery. *See* Pls.' Br. at 2-3 of 10. Plaintiffs took extensive discovery from the Individual Officers about their actions on the night of January 27th. Plaintiffs do not point to any evidence to suggest that the sworn testimony of the Individual Officers was perjurious or inaccurate. Indeed, Plaintiffs only speculate that the unavailable videos would have contradicted

the Individual Officers' testimony, as such, the only claim Plaintiffs argue could have been impacted by the missing video is the claim against the Individual Officers.

An adverse inference is not available against those Individual Officers.[2]  Plaintiffs do not articulate any materiality between their claims against the County and the unavailable video. Allowing for an adverse inference would be prejudicial to the Individual Officers.  An adverse inference instruction from the Court mandating that the jury presume the unavailable video would have been detrimental to the County's defenses, would carry with it a stigma that could not be cured by way of any limiting instruction.  This is because the jury will likely ascribe any shortfall on the part of the County itself to its employees as well.  For these reasons, Plaintiffs' motion for an adverse inference should be denied.

### C.  Federal Rule of Civil Procedure 37(e) Governs Plaintiffs' Motion and Plaintiff Fails to Prove Intent.

As noted, Plaintiffs must first establish that actual spoliation occurred.  If they are able to do so, Plaintiffs must further establish that any spoliation was done in bad faith.  *Bistrian,* 448 F. Supp. 3d at 465-66.  Plaintiffs cannot establish either requirement.

First, Plaintiffs cannot establish that the County failed to take reasonable steps to preserve the video from all of the cameras on Module A.  Indeed, the deposition of the County's designee, Clark Fulton demonstrates that the County took more than reasonable steps to preserve the video.

Mr. Fulton testified that he received a copy of the preservation letters and that steps were taken to preserve the video from the cameras on Module A.  *See* 2/12/22 Deposition of Clark Fulton at 45:8-16; 46:23 – 47:8 (attached hereto as Ex. A).  As such, counsel's request for preservation was provided to the appropriate personnel.

---

[2] Importantly, even if the missing video could have established that the Individual Defendants did not perform their duties strictly according to the policies, which the County Defendants deny, such negligence still would not constitute deliberate indifference.

Mr. Fulton further testified that the video from cameras one, two, three, and five were requested to be preserved for 60 days. *See id.* at 52:17 – 53:2. This was longer than the routine preservation of 30 days.[3] *See id.* at 53:7-15. This longer preservation time, however, created problems for the recording and running of the system. *See id.* at 53:16-21.

Mr. Fulton made multiple attempts to preserve the video from cameras two and five. With respect to camera two, Mr. Fulton testified that the change in preserving video from 30 days to 60 days "put a load on the server, this camera [two]'s server." *Id.* at 56:19 – 57:12. As a result, when Mr. Fulton tried to obtain the video, "the export would not complete." *Id.* at 57:10-12. Mr. Fulton also consulted the service provider, Honeywell about his inability to export the video. Honeywell advised that the "server [was] trying to do more than what it's really made to do." *Id.* at 57:13-16. Honeywell further advised that he was unable to access the video from Honeywell's system and that the export of videos would be limited to the technology that was available within the prison. *See id.* at 58:2 – 20.

Mr. Fulton testified that he made several attempts to export the video from camera two during the preservation period, but he was unsuccessful. *See id.* at 60:11-14. Ultimately, Mr. Fulton testified that he was limited by the technology and multiple attempts through Honeywell to obtain the video through other means were unsuccessful. *See id.* at 63:12 – 65:2.

With respect to camera five (referred to as the "PTZ camera"), Mr. Fulton confirmed that the camera had been experiencing intermittent outages during the overnight hours on January 27-28th. The service provider, Honeywell, was contacted first thing in the morning on January 28th. *See id.* at 66:6-19. Mr. Fulton further testified that he downloaded all the available video

---

[3] Mr. Fulton testified that the chief investigator, Frank Bochenek requested preservation of the video from the subject cameras to be extended from 30 days to 60 days.

from camera five and that he would have downloaded all available video if he did not encounter server and service issues. *See id.* at 78:9-20; 83:23 – 84:6 ("Q: All you know – what you can tell me is that after you got this letter, for the next several weeks, you were unable to download video that you would have otherwise wanted to download, correct? A: I attempted to download video that I could not do.").

In sum, Mr. Fulton made multiple attempts to export all of the requested video over the course of nearly 60 days. He also sought intervention from Honeywell to help resolve the technical issues but Honeywell was unable to access and preserve the video from its own database. *See id.* at 58:2 – 20; 63:12 – 65:2; 88:4 – 89:8. Mr. Fulton's testimony establishes that the County took reasonable efforts to preserve the requested video.

There are three factors that are relevant to assessing whether a party took reasonable steps to preserve ESI:

> First, Rule 37(e) recognizes that perfection is often impossible given the "ever-increasing volume of electronically stored information." Second, the Rule is to be applied with sensitivity to a party's "sophistication with regard to litigation." Third, "the routine, good-faith operation of an electronic information system" is a "relevant factor" in evaluating the reasonableness of a party's preservation efforts, "although the prospect of litigation may call for reasonable steps to preserve information by intervening in that routine operation."

*Bistrian,* 448 F. Supp. 3d at 474. Thus, Rule 37(e) applies "only if the information was lost because the party failed to take reasonable steps to preserve" it. *Id.* Here, Mr. Fulton testified as to the efforts that were made to preserve the video from cameras two and five. He also provided testimony about the technical limitations that prevented the export of the videos. These were reasonable steps and Plaintiffs have failed to demonstrate any spoliation. *See id.* For this reason, Plaintiffs' motion for an adverse inference should be denied. Because there is no spoliation, the Court does not even need to address the question of whether the deletion of the subject video was in bad faith. *See id.*

However, even if Plaintiffs could have established spoliation, Rule 37(e) warrants an adverse inference "only if a party acted 'with the intent to deprive another party of the information's use in the litigation.'" *Id.* at 475. In other words, even if spoliation occurred, Plaintiffs would still need to demonstrate bad faith. *See id.* Plaintiffs cannot do so here. It is undisputed that the prison administration alerted Mr. Fulton to the need to preserve the requested video. Additionally, the repeated and continuous efforts made by Mr. Fulton to export all of the video from cameras two and five are the antithesis of bad faith and a desire to deprive Plaintiffs of the information. Plaintiffs' motion must be denied.

## CONCLUSION

For these reasons, Plaintiffs' motion in limine for an adverse inference should be denied.

Dated: March 4, 2022.

Respectfully submitted,

*/s/ Kerri E. Chewning*
Kerri E. Chewning, Esquire
Jeffrey M. Scott, Esquire

Archer & Greiner, P.C.
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA 19103-7393
Telephone: (215) 963-3300
Facsimile: (215) 963-9999

*Attorney for Defendants*
*County of Bucks, Kircher, Rooney,*
*Columbia, Knoneborg, Mason, Ricci*
*and Gresko*

# EXHIBIT A

```
 1      IN THE UNITED STATES DISTRICT COURT
      FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2              2:20-cv-01685-MMB
                    -  -  -
 3

      NINA M. HARBAUGH, as      :
 4    Administrator of the      :
      ESTATE OF BRITTANY ANN     :
 5    HARBAUGH                   :
                                 :
 6            v.                 :
                                 :
 7    COUNTY OF BUCKS,           :
      et al.                     :
 8
                      AND
 9

       IN THE UNITED STATES DISTRICT COURT
10    FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
                NO. 2:19-CV-2187
11                  -  -  -
12    DAVID W. ADAMI and HEATHER :
      GIGLIO, Co-Administrators  :
13    of the ESTATE OF FREDERICK :
      J. ADAMI, Deceased         :
14                               :
             v.                  :
15                               :
      COUNTY OF BUCKS; BRIAN      :
16    KIRCHER; PATRICK ROONEY;    :
      STEVEN COLUMBIA; C.O.       :
17    KNONEBORG; THOMAS WEBER;    :
      TIMOTHY RICCI; DAVID W.     :
18    GRESKO; PRIMECARE MEDICAL, :
      INC.; MEDICAL JOHN DOES     :
19    1-10; and CORRECTIONAL      :
      OFFICERS JOHN DOE 1-10      :
20
                    -  -  -
21
              FEBRUARY 12, 2022
22
                    -  -  -
23
24
```

1          VIDEOTAPED ZOOM deposition of

2     CLARKE FULTON, taken pursuant to notice,

3     beginning at 9:30 a.m., on the above

4     date, before LISA MARIE CAPALDO, RPR,

5     Registered Professional Reporter and

6     Notary Public in and for the Commonwealth

7     of Pennsylvania.

8                    -   -   -

9

10

11

         GOLKOW LITIGATION SERVICES

12      877.370.3377 ph | 917.591.5672 fax

              deps@golkow.com

13

14

15

16

17

18

19

20

21

22

23

24

APPEARANCES:


KLINE & SPECTER, P.C.
BY:  DAVID K. INSCHO, ESQUIRE
1525 Locust Street
Philadelphia, PA  19102
(215) 772-1000
David.inscho@klinespecter.com
Appearing on behalf of the Plaintiff


MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN
BY:  JOHN R. NINOSKY, ESQUIRE
100 Corporate Center Drive, Suite 201
Camp Hill, PA  17011
(717) 651-3709
Jrninosky@mdwcg.com
-- For the Defendant
PrimeCare Medical, Inc.


ARCHER & GREINER, P.C.
BY:  JEFFREY M. KOLANSKY, ESQUIRE
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA  19103
(215) 963-3300
Jkolansky@archerlaw.com
-- For the Defendant
Bucks County





Also Present:  William Chan, Videographer

1                      -   -   -
2                   I N D E X
3                      -   -   -
4
5    Testimony of:
6              CLARKE FULTON
7
       By Mr. Inscho            10
8
9
                      -   -   -
10
              E X H I B I T S
11
                      -   -   -
12

   NO.      DESCRIPTION                    PAGE
13
   P-61    Defendants' Objections         49
14           and Supplemental
             Responses
15
   P-62    Side-by-Side Photo             67
16           Camera Two and Three
17   P-63    4/8/19 Honeywell E-mail       71
             Bates Stamp 470-473
18
   P-64    Camera Event Report            81
19           Bucks-Adami-000133-000146
20
21
22
23
24

```
 1              -   -   -

 2         DEPOSITION SUPPORT INDEX

 3              -   -   -

 4

 5   Direction to Witness Not to Answer

 6   Page Line      Page Line        Page Line

 7   None

 8

 9

10   Request for Production of Documents

11   Page Line      Page Line        Page Line

12   None

13

14   Stipulations

15   Page Line      Page Line        Page Line

16   None

17

18

19   Question Marked

20   Page Line      Page Line        Page Line

21   None

22

23

24
```

1    A.    I personally downloaded some

2  of the video and was aware of and/or saw

3  other video that investigations and

4  operations had stored -- or exported and

5  saved.

6    Q.    And you tell me now that

7  your recollection has been refreshed.

8        What was your involvement in

9  preserving video for Mr. Adami?

10    A.    So after the event, the

11  warden received a letter from an

12  attorney.  I don't know if it was you,

13  personally, or some office.  And he

14  brought that letter to the morning staff

15  meeting and showed it to the director and

16  then showed it to me.

17        I took that letter and

18  either scanned it myself or gave it to

19  the administrative assistant to scan and

20  sent it to the solicitor's office.

21        Sometime after that, I

22  received, I think, an e-mail from

23  Frank Chernak explaining that he was

24  now --

1    MR. KOLANSKY:  Hold it.

2    Yeah.  Beyond that, don't say

3    anything else about what Frank

4    told you.

5    THE WITNESS:  Oh, okay.

6    I received --

7    MR. KOLANSKY:  You can say

8    what you did as a result of any

9    e-mail, but you can't say what he

10    told you.

11    THE WITNESS:  I received an

12    e-mail --

13    -  -  -

14    (Overlapping speakers.)

15    -  -  -

16    BY MR. INSCHO:

17    Q.    What did you do next?

18    A.    I'm sorry.  I didn't hear

19    you, sir.

20    Q.    You got an e-mail from

21    Frank Chernak.

22    What did you do next?

23    A.    I started to try and

24    download video.

1      Q.    And what video did you
2  download?
3      A.    The camera that looked -- or
4  actually showed either the cell or a
5  portion of the cell and the -- what I
6  call the PTZ, or tilt, pan, zoom -- TPZ
7  camera, which was the one in the center
8  of the module.
9      Q.    Were you involved in --
10 personally in preserving video of any
11 other cameras?
12     A.    No.
13     Q.    So we're talking about
14 Module A.
15          And would you have, at the
16 time, had access to all of the cameras on
17 Module A?
18     A.    Yes.
19     Q.    And there are five cameras
20 on Module A, correct?
21     A.    Yes.
22     Q.    And so we can kind of talk
23 about that in this deposition.
24          You have the interrogatories

1  that counsel previously sent, and it

2  refers to counsel one -- I'm sorry --

3  camera one as a camera that observes an

4  officer at the workstation right where

5  you come into the block.

6              Is that a name, by the way,

7  that you would use for -- would you use

8  that?  Would you call that camera one at

9  the jail, or is that just a name that the

10 lawyers --

11             THE WITNESS:  That's just a

12       number that I think Mr. Chernak

13       used to identify -- somebody is

14       knocking at my door.

15             Can I just quick --

16             MR. INSCHO:  Go ahead.

17             THE VIDEOGRAPHER:  Going off

18       video record, 9:59 a.m.

19                   -  -  -

20             (Whereupon, a brief recess

21       was taken.)

22                   -  -  -

23             THE VIDEOGRAPHER:  Back on

24       video record, 10:01 a.m.

BY MR. INSCHO:

Q.     So we're going to use counsel's nomenclature for the cameras.

A.     Okay.

Q.     Do you have the interrogatory there in front of you?

A.     I don't.  It was sent to me in soft copy.  I don't have it printed or anything.

Q.     I'm just pulling it up.  I'm going to mark it as Exhibit P-61.

                    -   -   -

            (Whereupon, Exhibit P-61 was
        marked for identification.)

                    -   -   -

BY MR. INSCHO:

Q.     Mr. Fulton, can you see the interrogatory here?

A.     Yes.

Q.     So just --

                    -   -   -

            (Overlapping speakers.)

                    -   -   -

            MR. KOLANSKY:  I apologize.

1    I just don't know where you are

2    without scrolling through mine.

3         MR. INSCHO:  Oh, I'm sorry.

4    I'm on page four --

5         MR. KOLANSKY:  Okay.

6    Thanks.

7         MR. INSCHO:  -- in the

8    supplemental response to

9    interrogatory number four.

10         MR. KOLANSKY:  Yeah.  Okay.

11         MR. INSCHO:  And this is

12    where we talk about -- where he

13    gives each of the five cameras

14    names.

15         MR. KOLANSKY:  Got it.

16 BY MR. INSCHO:

17         Q.    Camera one is a camera by

18 the entrance to the module pointed at the

19 officer's workstation.

20              Camera two is the fixed

21 camera mounted on the second tier that

22 looks inward towards the back of the

23 module.

24              Does that make sense to you,

1  Mr. Fulton?

2      A.    Yes.

3      Q.    Camera three is a fixed

4  camera mounted on the second tier

5  concrete deck that looks outward toward

6  the front of the module.

7            Does that make sense to you,

8  Mr. Fulton?

9      A.    Yes.

10     Q.    That's the camera you've

11 described that was saved by -- one of the

12 cameras that was saved by you, correct?

13     A.    Yes, if it's the one that

14 shows the cell entry -- the cell entry

15 door or area where Mr. Adami was.

16     Q.    The fourth camera looked

17 into the phone room?

18     A.    Yes.

19     Q.    And then camera five is a

20 sweeping camera, which I believe is the

21 camera you described as the TPZ camera?

22     A.    Yes, the tilt, pan, zoom.

23     Q.    I don't have much to say

24 about camera one and camera four, but I

1  want to talk about cameras two, three,

2  and five, okay?

3           Is it accurate, Mr. Fulton,

4  that you knew, and the county was aware,

5  that as of receipt of the letter from my

6  office, that the cameras would be deleted

7  in either 30 or 60 days?

8       A.    Yes.

9       Q.    There's discussion in this

10  interrogatory, which I will show you,

11  that indicates some of the cameras' tape

12  you saved for 60 days, or was it the time

13  saved for 60 days.

14           Do you have a recollection

15  of that?

16       A.    Yes.

17       Q.    Which cameras were preserved

18  for 60 days?

19       A.    I believe it was camera one,

20  two, three, and five, I believe.

21           I wasn't the one who

22  requested them to be preserved.  That

23  came from Frank Bochenek, the chief

24  investigator, if I recall.  But it may

1  have been all five.  I don't know for
2  sure.
3       Q.    And why were they saved for
4  60 days?
5       A.    Again, I don't remember if
6  all five were or specific ones were.
7       Q.    Why were they saved for
8  60 days?
9       A.    The investigations
10  department -- I think it was Frank
11  specifically, the chief investigator --
12  had been conducting some investigation on
13  that block prior to this event and had
14  asked that those cameras be extended from
15  a normal 30-day cycle out to 60 days.
16       Q.    And the county was able to
17  do that?
18       A.    We can do that using the
19  software, but it does create other issues
20  or problems in the system of recording
21  and running.
22       Q.    And this was investigating
23  some sort of inmate activity?
24       A.    I don't know what he was

 1    investigating.  I wasn't privy to that.

 2         Q.    It wasn't investigating an

 3    inmate death, correct?

 4         A.    I don't know what it was

 5    investigating.

 6         Q.    So I'm going to go down to

 7    camera two, okay?  And bear with me.  I

 8    will show you what's marked as

 9    Exhibit P-35.

10              Did this come up for you?

11         A.    It did.

12         Q.    So this is a still shot.

13              Will you agree with me that

14    this is a still shot of what we're

15    calling camera two?

16         A.    Yes.

17         Q.    And camera three is actually

18    seen here in the middle tier?

19         A.    Yes.

20         Q.    And so I'm showing you P-57.

21         A.    Nothing came up.  Oh, okay.

22         Q.    Do you see the clip P-57?

23         A.    Yes.

24         Q.    This is camera three.

1           This is the one that you

2  preserved, correct?

3           A.    Yes.

4           Q.    And Mr. Adami's cell is in

5  the direction of where this -- cell five

6  is in the direction of where this officer

7  is walking, correct?

8           A.    Over to the right.

9           Q.    I guess he's not -- you

10  can't see him moving in that particular

11  clip, but the way he's facing is towards

12  cell five, correct?

13          A.    Well, let's see.  It would

14  be one, two, three -- yes.

15          Q.    Now, I'm going to bring

16  up -- do you have the two photos next to

17  each other, Mr. Fulton?

18          A.    Yes.

19          Q.    So the photo on the right is

20  camera three.

21              And you preserved -- the

22  camera you preserved, correct?

23          A.    Yes.

24          Q.    And the photo on the left is

1  camera two.

2          And on camera two,

3  Mr. Adami's cell is off to the left-hand

4  side, correct?

5          A.    Yes.

6          Q.    So what we're seeing here --

7  if I'm correct, we're seeing a lot of the

8  same things.

9          There's overlap in these two

10 cameras, correct?

11         A.    Yeah.  In the dayroom, yes.

12         Q.    The dayroom, right.

13         So the gentleman sitting in

14 camera two, the gentleman sitting here in

15 the far lower left-hand corner, that

16 chair is the same chair by where the

17 gentleman is standing in camera three?

18         A.    That's correct.

19         Q.    Did you preserve any of the

20 video from camera two?

21         A.    No.

22         Q.    Why not?

23         A.    So as I mentioned, when

24 investigations asked for those cameras to

1  be extended and record more than 30 days,

2  it put a load on this server, this

3  camera's server.  And trying to export

4  video became almost impossible.  The

5  server was working beyond its capacity,

6  if you will.

7            And I'll preface this all as

8  I'm not a technical IT person, but this

9  is how I understand it:

10           So when I tried to export

11 video, it would error.  The export would

12 not complete.

13           And in speaking to Honeywell

14 about that, they said, well, the server's

15 trying to do more than what it's really

16 made to do.

17           And the network -- the

18 county network that it wrote on is having

19 difficulty pulling all these files over

20 to my workstation, which is the one that

21 I went into in December to find the files

22 that I had dumped.

23           So the attempts that I did

24 to pull any video errored and failed for

1  a while, quite a while.

2          And it was then I asked

3  Honeywell -- I went to Honeywell and

4  said, well, is there any other way to get

5  this video?  Can someone from Honeywell

6  go into the database and just extract it?

7          And Clem Young researched

8  that with the engineers and technicians

9  and Honeywell and said, no.  You can't do

10 that.  You have to use the DVM

11 application, which was on my workstation.

12         So it was discussed some

13 more.  And I met with the director, and

14 we decided to try and do some exporting

15 when the network was not as busy, meaning

16 people left for the day.  There was just

17 less computer activity or users on the

18 network.  So I stayed and worked,

19 actually, until 1:00 in the morning,

20 pulling off the video that I did produce.

21     Q.    So when you stayed after

22 hours, you were able to download

23 camera three.  Is that right?

24         A.    I was, yes.

1    Q.    You were also able to
2  download some of the PTZ camera as well?

3    A.    That's my recollection,
4  yeah, the clip from the PTZs.

5    Q.    So if I understand it --
6  then why is that the reason why you
7  didn't download camera two?

8    A.    So when I did this, it was
9  the day before all this was being
10  overwritten and gone and deleted.

11    Q.    When did you first attempt
12  to download video?

13    A.    Probably a week after the
14  event.

15    Q.    So at that point, you would
16  have had a substantial amount of time
17  before the video was going to be deleted?

18    A.    Yes.

19        MR. KOLANSKY:  Objection to
20        the form of the question.

21  BY MR. INSCHO:

22    Q.    Am I correct?  You would
23  have had about 53 days if it was
24  seven days after the event?

1       A.     Well, it would be 60 days,

2  yeah, minus -- yeah, about 50 days.

3       Q.     And it's your recollection

4  that the time when you finally were able

5  to download video when you stayed after

6  hours, that was on literally the last day

7  before it deleted?

8       A.     Yes.

9       Q.     And, of course, you knew

10 that deadline was coming.  Is that right?

11      A.     Well, I was attempting to

12 download for -- every week or two, once

13 or twice a week, during that whole

14 timeframe.

15      Q.     Was the county aware -- were

16 your superiors at the county aware that

17 you were unable to download this video

18 which was going to be deleted at a

19 certain point?

20      A.     The director of corrections

21 was aware that there were issues with the

22 cameras, yeah -- with the system.  And

23 counsel was aware.

24      Q.     So at this point, you, the

1 director, and counsel all knew that there

2 was essentially a deadline where the

3 video was going to be deleted and not

4 going to be available anymore, correct?

5          A.    Counsel knew that I was

6 trying to download video, and I was

7 having difficulty.

8          Q.    Did counsel also know that

9 at some point, that video was just going

10 to be overwritten and wouldn't be

11 available anymore?

12          A.    Yes.

13          Q.    Did anyone watch the

14 camera two video that couldn't be

15 preserved?

16               MR. KOLANSKY:  If you know.

17               THE WITNESS:  Yeah.

18               I don't know who watched

19          what.  I only know what I

20          downloaded.

21 BY MR. INSCHO:

22          Q.    So the video that you

23 downloaded for camera three, you

24 downloaded because you were able to get

1    that done in time.  Is that fair?

2         A.    Yes.

3         Q.    And you didn't download

4    camera two because you couldn't get it

5    done in time?

6         A.    Well, when I looked at what

7    was there, that was the camera that

8    showed the cell, and that's the one I

9    took as a priority to download.

10         Q.    Had you had -- had you had

11    more time or had it not been -- did not

12    have the system issues, would you have

13    downloaded camera two as well?

14              MR. KOLANSKY:  Objection.

15         Form of the question.

16              You can answer.

17              THE WITNESS:  Repeat your

18         question?  I'm sorry.

19    BY MR. INSCHO:

20         Q.    Sure.  Sure.

21              Had you had more time -- in

22    other words, had it not been the very

23    last day when you were able to download

24    the video, had you had another 30 days or

1 had there not been the system issues

2 which caused all the problems before

3 that, would you have downloaded

4 camera two as well?

5             MR. KOLANSKY:  Same

6       objection.

7             Go ahead.

8             THE WITNESS:  I would have

9       attempted to do it, probably.

10       Yes.

11 BY MR. INSCHO:

12       Q.    I want to talk about the --

13 did anyone make any suggestions to you --

14 either IT, Honeywell, counsel, anyone --

15 about any other ways to preserve this

16 video as the deadline was coming when it

17 was going to get overwritten?

18             MR. KOLANSKY:  Other than

19       counsel, you can answer that.

20 BY MR. INSCHO:

21       Q.    You can answer.

22       A.    Yes, Honeywell.

23       Q.    Honeywell did.

24             What did they suggest?

1    A.    So Honeywell was aware of

2 our problems on the network, and not with

3 just this server but all the camera

4 servers and problems doing some

5 downloads.

6          So my first request to

7 Honeywell was, you know, what can you do

8 about this.

9          They said they don't control

10 the network.  That's the county's.

11          And as I explained, my next

12 question was:

13          Is there a way to just go

14 into the database, then, without using

15 the application?  Could Honeywell do that

16 and just fetch this stuff off and store

17 it somewhere?

18          Clem Young went back and

19 researched that.  I believe he talked to

20 Ken Chapel and the engineer,

21 John Schulberger, I believe his name was.

22          And they said, no.  You have

23 to use the application.  You have to use

24 your workstation and the network.

1    So that's what I was left

2  with doing.

3    Q.   Do you know if anyone from

4  the county ever suggested contacting the

5  counsel that had requested the video be

6  preserved during the time period before

7  the video was deleted?

8    A.   Did I suggest that?  No.

9    Q.   Do you know if anyone did?

10    A.   I don't know.

11    Q.   With regard to the PTZ

12  camera, which we are referring to as

13  camera five, I understand there were

14  intermittent issues with camera five

15  starting at 1:00 a.m. on the 28th, the

16  day Mr. Adami was found in his cell.

17    Is that accurate?

18    A.   I believe that's when it's

19  reported.  There may have been --

20  somebody might not have noticed those --

21  it could have started before that.

22    But I think at 1:00 a.m.,

23  the shift commander notices that there's

24  a problem with not only that TPZ but, I

1  think, all the PTZs that were on that

2  particular server and switch.

3      Q.    Is that your recollection,

4  or is that something that you reviewed

5  prior to the deposition today?

6      A.    I read the shift report last

7  night where the lieutenant reports that

8  at 1:00 a.m., that he's got problems with

9  cameras.

10     Q.    Do you have any reason to

11  believe there were any issues with the

12  TPZ cameras prior to 1:00 a.m.?

13     A.    No.

14     Q.    And is it your understanding

15  that those problems then were described

16  as intermittent with the cameras

17  throughout the morning time from

18  1:00 a.m. until 6:30, when Honeywell was

19  called?

20     A.    I'm not sure what you mean

21  by intermittent.

22     Q.    Well, that's not my choice

23  of words, but I can show you -- I'm going

24  to show you a document which I'll mark as

1  P-62.

2                    - - -

3              (Whereupon, Exhibit P-26 was

4        marked for identification.)

5                    - - -

6  BY MR. INSCHO:

7        Q.    I just want to make sure I'm

8  looking at the right e-mail.  Yeah.  This

9  is Bates number P-470 to 473.

10             It's an e-mail exchange from

11  a Samuel Rosenstein at Honeywell with a

12  Brett Waldren, Michael Hayes, Alim Jumet

13  at Honeywell about proposed answer to

14  question from Bucks County.

15             Do you see that?

16        A.    Okay.

17        Q.    It attaches a document where

18  it says, Honeywell's responses to

19  questions from Bucks County.

20             It says, one:  When, why,

21  and for how long was the TPZ camera in

22  A module at the Bucks County Correctional

23  Facility not functioning properly on

24  January 28th, 2018?

1            Do you see that?

2       A.    Yes.

3       Q.    And the answer here is that

4  according to the event log, of which the

5  TPZ camera is a part, intermittent

6  failure started at 1:19.

7            Do you see that?

8       A.    Yes.

9       Q.    And you have no indication

10 that the camera wasn't working properly

11 up until 1:19.

12            Can you tell me whether or

13 not it was working part of the time

14 between 1:19 and 6:30?

15      A.    So I don't become aware of

16 all this until after the fact.  So this

17 all happens in the overnight hours,

18 early-morning hours of January 28, when

19 the lieutenant observes, through

20 observation, that he's got camera

21 problems.

22      Q.    I understand.  I understand

23 you learned about all this afterwards.

24            Afterwards, have you

1 learned, was there any video between 1:19

2 and 6:30 a.m. from the TPZ camera on

3 Module A?

4     A.    I don't recall.

5     Q.    Do you understand when I

6 hear intermittent, I hear as it was

7 working some of the time and not working

8 other parts.

9             Would that be your

10 understanding of intermittent?

11     A.    Yeah.  I would say so.

12 Sure.

13     Q.    The video preserved from the

14 TPZ camera stops at 7:30 p.m.

15             Did you preserve the

16 video --

17                - - -

18             (Whereupon, a discussion off

19      the record occurred.)

20                - - -

21             THE VIDEOGRAPHER:  Going off

22      video record, 10:26 a.m.

23                - - -

24             (Whereupon, a brief recess

1  was taken.)

2  − − −

3  THE VIDEOGRAPHER:  Back on

4  video record, 10:33 a.m.

5  BY MR. INSCHO:

6  Q.  I'm sharing, again, that

7  P-62 with you, Mr. Fulton.

8  You would agree with me that

9  based on what Honeywell told you, the TPZ

10  camera was working for periods of time

11  between 1:19 a.m. and 6:30 a.m., correct?

12  A.  Well, this is saying that

13  they provided some kind of a report that

14  showed activity on the network with the

15  cameras.  Yes.

16  Q.  And that based on this

17  statement here, it says, intermittent

18  failures that sometimes it would be

19  working, and sometimes it would not,

20  correct?

21  A.  Well, it's referring to TPZ.

22  I don't see where it's referring to the

23  A module one because I think it was

24  actually all the TPZs in a bunch of

1  different places.

2          Q.    So I'll show you the -- I'll

3  mark it as P-63.

4                        -  -  -

5                (Whereupon, Exhibit P-63 was

6        marked for identification.)

7                        -  -  -

8  BY MR. INSCHO:

9          Q.    This is the actual event

10  summary report provided by Honeywell.

11                Do you see the document?

12        A.    Yes.

13          Q.    And it goes in descending

14  order.

15                So we'll go to the bottom,

16  which is page 146.  And the first times

17  here we see are on the 27th at 7:54 p.m.,

18  and then it describes the camera over

19  here in the second-to-the-last column.

20                Do you see that?

21        A.    Yep.

22          Q.    So if we go to 145, we see

23  the first mention here, DMV camera,

24  A mod, PTZ.

1          Would you read that as the
2  A module PTZ?
3          A.    Yeah.  Yeah.
4          Q.    And that indicates here at
5  1:19 and two seconds, that it failed.
6          That would be the first
7  indication that the camera wasn't
8  working, correct?
9          A.    Well, I am not a Honeywell
10  technician, but it means something is
11  wrong.  Yep.
12          Q.    And then at 1:19:03, it has
13  an action for the same camera, and it
14  says, okay.
15          Do you see that?
16          A.    Yep.
17          Q.    And I'll represent to you
18  that we can go up here, and we can go
19  through it.
20          1:19 and 20 seconds, it
21  says, failed on Bates number 144.
22          And then at the same time,
23  it says, okay.
24          We can go through that all

1    the way through until 6:30.

2         A.    Okay.

3         Q.    But --

4              -  -  -

5              (Overlapping speakers.)

6              -  -  -

7              MR. KOLANSKY:   --

8         intermittent failures.

9              MR. INSCHO:  That's exactly

10        the question I've got.

11   BY MR. INSCHO:

12        Q.    Indicating that there were

13   intermittent failures during that time.

14              Do you have any reason to

15   believe that there was not at least some

16   video available during this period of

17   time where there were intermittent

18   failures?

19        A.    So I don't know -- this is

20   telling me -- the way I interpret this,

21   it's telling you that this camera is

22   going on and off -- you know, it's having

23   these issues.

24              But when it says it's okay,

1  I don't know if it's actually recording

2  or if it's just showing you something.

3       Q.   Well, did you ever look to

4  see if there were any PTZ recordings for

5  Module A from 1:19 until 6:30 a.m.?

6       A.   I don't remember

7  specifically, but I probably did.

8       Q.   So let's start with the time

9  7:30 p.m. until 1:19 a.m.

10      A.   What date are you on?

11      Q.   I'm sorry?

12      A.   What date are you on?

13      Q.   1/27.  So from January 27,

14  7:30 p.m. until January 28th at 1:19.

15           During that time, there's no

16  indication there were any issues with the

17  PTZ camera.

18           And why was the video from

19  that time not preserved?

20           MR. KOLANSKY:  Objection to

21      the form of the question.

22                -  -  -

23           (Overlapping speakers.)

24                -  -  -

1      MR. KOLANSKY:  Hold on.

2      You already said you don't

3  know if it was recording, but you

4  can go on from there.

5      MR. INSCHO:  Well, no, no,

6  no.  I'll re-ask the question.

7  BY MR. INSCHO:

8      Q.    Is there any reason that you

9  have -- do you have any indication that

10  the camera was not recording and not

11  having any issues at all prior to

12  1:19 a.m.?

13      A.    On the 28th?

14      Q.    On the 28th.

15      A.    Yeah.  I don't recall of any

16  issues.  No.

17      Q.    So my question is:

18      From 7:30 p.m. on the 27th

19  until 1:19 a.m. on the 28th, why was that

20  video not preserved?

21      A.    It was deleted.  It was

22  gone.

23      Q.    Why was it not saved before

24  it was deleted?

1    A.    Attempts to do that, as I

2 said, would error out.  It wouldn't work.

3    Q.    How were you able to

4 preserve the video up until 7:30 p.m. but

5 not able to preserve the video

6 afterwards?

7    A.    I'm not sure -- I'm not

8 getting your question.  I'm sorry.

9    Q.    Well, I have TPZ video saved

10 that's been produced up until 7:30 p.m.

11 on the 27th of January.

12    A.    Okay.

13    Q.    You were able to save that

14 video, right?

15        Why were you not able to

16 save the video after 7:30 -- from 7:30 to

17 1:19?

18    A.    It was gone or I left at

19 1:00 in the morning.

20    Q.    So the same reasons you told

21 me before.

22        You didn't preserve it

23 because you essentially ran out of time?

24    A.    Yes.

1    Q.    Is that fair?

2    A.    Yeah.

3    Q.    Did you ever --

4         MR. KOLANSKY:  David, I

5    object to that.

6         I think there's an

7    additional piece to that that

8    you're not asking, which is about

9    the system timing out and the

10   system breaking down and not

11   allowing him in.

12        So, yeah.  Maybe he ran out

13   of time.  But there were reasons

14   behind that because for a period

15   of time, the system was crashing,

16   or whatever the right words are

17   for not allowing recordings to be

18   pulled down.

19        He's already answered that.

20   I'm just repeating something he's

21   already said.  I don't think you

22   included it in this question.

23        MR. INSCHO:  I understand.

24 BY MR. INSCHO:

1    Q.    On the 60th day, Mr. Fulton,

2  you stayed late and were able to download

3  some of the video?

4    A.    I don't know if it was

5  exactly the 60th day.  58, 59, somewhere

6  in there.  But, yes.  I stayed until, I

7  think it was 1:00 in the morning, and

8  downloaded video.

9    Q.    And the reason you weren't

10  able to download more video in that same

11  fashion is because the video was then

12  deleted?

13    A.    It was unavailable.  I

14  did -- if I recall.  I'd have to refer

15  back to the document -- I think I did,

16  like, 20 hours of camera -- I think it

17  was camera three is the one where most of

18  that video is that I downloaded and then

19  whatever was available on the PTZ at that

20  time.

21    Q.    Would you have had -- absent

22  the time constraint of the video being

23  deleted and the issues you had with the

24  errors prior to that, not being able to

1  download it, would you have downloaded

2  all of the TPZ video that was available?

3          MR. KOLANSKY:  Objection.

4      Calls for speculation.

5          You can answer.

6          THE WITNESS:  I would have

7      downloaded -- yes.

8  BY MR. INSCHO:

9      Q.    So there was PTZ video that

10 you would have downloaded if you could

11 have, but you were not able to because of

12 the technical issues and then the timeout

13 of the video being overwritten.

14          Is that fair?

15          MR. KOLANSKY:  Objection.  I

16      don't think he can possibly know

17      that because he doesn't know what

18      all was there now.  He says he

19      would have if he could have.  He

20      doesn't know what was there.

21          You're asking him now if the

22      reason was because of running out

23      of time.  He doesn't even know it

24      was there.  He was trying to get

1     it downloaded.

2          As he said, a number of

3     times and in the interrogatories,

4     that there were system failures,

5     and that was the main cause.

6          I understand where you're

7     going with this.  I understand

8     that you're --

9          MR. INSCHO:  Okay.

10    Respectfully, I get it.  I get it.

11         MR. KOLANSKY:  Well, okay.

12    But one more point.

13         I'm not trying to prevent

14    you from getting answers.  I'm

15    just trying to have you get

16    answers that he has knowledge of.

17         MR. INSCHO:  Okay.  But

18    there is zero evidence anywhere

19    that there was no video -- that

20    there was video that was not

21    recorded up until 1:19 a.m.

22    There's just nothing to support

23    that there was no video during

24    that time from that camera.

1    There's nothing there.  I mean,

2    there's no reason --

3              -  -  -

4         (Overlapping speakers.)

5              -  -  -

6         MR. KOLANSKY:  Except for

7    his testimony that that system --

8    there's nothing to support that

9    there was or wasn't.  The system

10   wasn't allowing him to get it for

11   intermittent periods for 60 days.

12   He says he went in every week or

13   so to try and get it done, and the

14   system kept crashing.

15        Finally they decided, at the

16   end of the time, that this might

17   work, and it did.

18        MR. INSCHO:  I'm going to

19   show you what I'll mark as

20   Exhibit-64.

21              -  -  -

22        (Whereupon, Exhibit P-64 was

23   marked for identification.)

24              -  -  -

1    BY MR. INSCHO:

2         Q.    This is a letter from my

3    office which was mailed to

4    Christopher Pirolli, who was the director

5    of corrections as of February of 2018,

6    correct, Mr. Fulton?

7         A.    Yes.

8         Q.    And I believe you said that

9    you would have gotten this letter asking

10   to record information, and you would have

11   either scanned it yourself or had it

12   scanned, correct?

13        A.    I don't recall this letter.

14   I thought there was a letter that was

15   sent to the warden.

16        Q.    Do you see on the screen a

17   letter addressed to the warden on the

18   14th of February?

19             MR. KOLANSKY:  No.

20             THE WITNESS:  No.

21   BY MR. INSCHO:

22        Q.    Now, this is a letter to the

23   warden.

24             Would this have been a

1  letter like the one that you would have

2  scanned or had scanned after it was

3  received?

4      A.    I believe this is it.  Yes.

5      Q.    And the last paragraph here

6  says, with regard -- last sentence,

7  brother, we would like to set up a

8  mutually convenient time to view any

9  video or photographs of the incident

10  event prior to Mr. Adami's death.  Please

11  contact us to discuss scheduling.

12          Do you see that?

13      A.    Yes.

14      Q.    As far as you know, no

15  opportunity was given to Mr. Adami's

16  family or his attorney at any point prior

17  to the video being deleted, correct?

18      A.    I don't know what counsel

19  may have done or not.

20      Q.    You don't know of any,

21  correct?

22      A.    No, I don't.

23      Q.    All you know -- what you can

24  tell me is that after you got this

1   letter, for the next several weeks, you

2   were unable to download video that you

3   would have otherwise wanted to download,

4   correct?

5        A.    I attempted to download

6   video that I could not do.  Yes.

7        Q.    Did you watch any of the

8   video other than the video you were able

9   to download?

10       A.    No.

11       Q.    So you don't know what is on

12  the -- camera two that you weren't able

13  to download, and you don't know what is

14  on any of the PTZ video which you were

15  unable to download, correct?

16       A.    That's correct.

17       Q.    Do you know if anyone at the

18  county watched any of that video to

19  determine whether or not it had anything

20  relevant on it prior to it being erased?

21       A.    I don't know what anybody

22  else did.

23       Q.    Do you have any reason to

24  believe that someone from the county

1   would have sat down and watched that

2   video at some point prior to it being

3   erased?

4               MR. KOLANSKY:  Object to the

5           form.

6               You can answer.

7               THE WITNESS:  I would refer

8           to the investigations office, the

9           district attorney's office, and

10          the operations security office.

11          They would be the people that I

12          would think would do that or could

13          do that or may or may not have.  I

14          don't know.

15  BY MR. INSCHO:

16          Q.    So from your perspective as

17  the guy who is trying to get the video

18  before the video goes away, you don't

19  remember any conversations where you

20  said, hey, we should look at this video

21  because I can't get it downloaded, and

22  it's going to get deleted?

23          A.    No.

24          Q.    While you weren't able to

1 download the video, do you know if you

2 were able to view it?

3     A.    I believe you could view it.

4     Q.    It was the kind of

5 downloading it from the server that

6 overloaded it.  Is that fair?

7     A.    Generally, again, I think

8 there was multiple components to why it

9 errored.  But the application, the server

10 and the network combined, yeah, were

11 creating problems.

12     Q.    And when you got the error

13 is when you tried to download the video,

14 correct?

15     A.    You didn't get an error.  It

16 just stopped.  It would not complete.

17     Q.    Other than counsel -- or

18 outside counsel for the county and

19 Mr. Pirolli, who else was aware of the

20 inability to download the video?

21     A.    Probably the administrative

22 assistant who worked for us in

23 administration.  She didn't do it, but

24 she was probably aware of the problems of

1  us doing it.

2          And then Honeywell, a bunch

3  of people at Honeywell were aware.

4      Q.    How did you make the people

5  at Honeywell aware of the issues that you

6  were having downloading the video?

7      A.    I either talked to them

8  directly or called them.

9      Q.    Do you know if anyone other

10 than Mr. Clem did anything -- in other

11 words, came out or tried to do

12 anything -- to find the video?

13     A.    So Clem was the on-site

14 technician.  I'm pretty sure he told me

15 he spoke to Ken Chapel, who was also kind

16 of a higher-level architecture guy for

17 Honeywell who also came to our

18 facilities, and then John Schulberger,

19 the engineer who built and knew our

20 system inside and out.

21          I may have raised a ticket

22 for it also in the Honeywell system -- or

23 Clem may have raised a ticket just to

24 kind of account for his time.  If he used

1  up time looking at something, I think he

2  had to account for his time by putting a

3  work ticket or a work order in.

4      Q.    And this would be a ticket

5  not with regard to the repair of the PTZ

6  camera outage on the 28th but actually on

7  the inability to download the video?

8      A.    Yeah.  His efforts to

9  investigate that or whatever, yeah.  He

10  has to account for his hours somehow, and

11  he may have done that.  You'd have to ask

12  him.  I don't know if he did it or not.

13      Q.    Do you know if you e-mailed

14  at all with any of the Honeywell folks

15  about this issue?

16      A.    I don't recall.

17      Q.    Do you know if anyone from

18  Honeywell actually did anything?

19          In other words, did they

20  actually try to access the system or take

21  any steps to attempt to download that

22  video?

23      A.    I only know what was

24  reported to me by Clem.  I don't know

1  what these other folks he spoke to may or
2  may not have done.
3          Q.    What Clem said is that they
4  can't do it through the database?
5          A.    He told me that they could
6  not export the video directly from the
7  database, which is what I discussed with
8  him.
9          Q.    Is it accurate that with
10 regard to the -- camera two, that at no
11 point did you view that video on the
12 night of the 27th, into the 28th, and
13 determine that it was irrelevant to any
14 issues involving Mr. Adami, correct?
15         A.    I didn't view anything on
16 the 27th and 28th.
17         Q.    And with regard to the PTZ
18 video, same thing:
19               You didn't view any of the
20 video on the 27th and 28th and determine
21 that it was not relevant to Mr. Adami or
22 the monitoring of Mr. Adami or anything
23 like that?
24         A.    You're not asking me if I

1    did it at that time on those dates.

2              You're asking me if I ever

3    did it?

4         Q.    So, yeah.

5              I'm asking you if -- when

6    the video was available, if you watched

7    it.

8         A.    No.

9              MR. KOLANSKY:  He's already

10        said, no.

11             THE WITNESS:  No.  I did not

12        watch it.

13   BY MR. INSCHO:

14        Q.    Were you ever present while

15   any counsel watched any of the video?

16        A.    No.

17             MR. INSCHO:  That's all the

18        questions I have for you,

19        Mr. Fulton.  I appreciate your

20        time.  I hope you have a good time

21        getting your work done with your

22        home.

23             MR. NINOSKY:  No questions.

24             MR. KOLANSKY:  Just a

1      couple.  Actually, no.  It was

2      covered.  Thanks.

3           THE VIDEOGRAPHER:  This

4      concludes today's deposition.

5      Going off record at 10:54 a.m.

6                -  -  -

7           (Whereupon, the deposition

8      concluded.)

9                -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CERTIFICATE

1
2         I, Lisa Capaldo, Registered Court
3    Reporter, do hereby certify that prior to
4    the commencement of the examination,
5    CLARKE FULTON was duly remotely sworn by
6    me to testify to the truth, the whole
7    truth, and nothing but the truth.
8         I DO FURTHER CERTIFY that the
9    foregoing is a verbatim transcript of the
10   testimony as taken stenographically by me
11   at the time, place, and on the date
12   hereinbefore set forth, to the best of my
13   ability.
14        I DO FURTHER CERTIFY that I am
15   neither a relative nor employee nor
16   attorney nor counsel of any of the
17   parties to this action, and that I am
18   neither a relative nor employee of such
19   attorney or counsel, and that I am not
20   financially interested in the action.
21
22   _____
     Lisa Capaldo, RPR
23   Notary Public
24

1        INSTRUCTIONS TO WITNESS

2

3            Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8            After doing so, please sign

9    the errata sheet and date it.

10            You are signing same subject

11    to the changes you have noted on the

12    errata sheet, which will be attached to

13    your deposition.

14            It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24

```
 1              _ _ _ _ _ _

               E R R A T A

 2              _ _ _ _ _ _

 3     PAGE   LINE      CHANGE  |  REASON

 4     _____  _____   _____

 5     _____  _____   _____

 6     _____  _____   _____

 7     _____  _____   _____

 8     _____  _____   _____

 9     _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____
```

## ACKNOWLEDGMENT OF DEPONENT

I,_____, do
hereby certify that I have read the
foregoing page and that the same is a
correct transcription of the answers
given by me to the questions therein
propounded, except for the corrections or
changes in form or substance, if any,
noted in the attached Errata Sheet.

_____
Clarke Fulton                          DATE

Subscribed and sworn
to before me this
_____ day of _____, 20____.
My commission expires:_____

_____
Notary Public

1

# LAWYER'S NOTES

2

PAGE   LINE

3     _____    _____    _____

4     _____    _____    _____

5     _____    _____    _____

6     _____    _____    _____

7     _____    _____    _____

8     _____    _____    _____

9     _____    _____    _____

10    _____    _____    _____

11    _____    _____    _____

12    _____    _____    _____

13    _____    _____    _____

14    _____    _____    _____

15    _____    _____    _____

16    _____    _____    _____

17    _____    _____    _____

18    _____    _____    _____

19    _____    _____    _____

20    _____    _____    _____

21    _____    _____    _____

22    _____    _____    _____

23    _____    _____    _____

24    _____    _____    _____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DAVID W. W. ADAMI and HEATHER L. GIGLIO, CO-ADMINISTRATORS of the ESTATE OF FREDERICK J. ADAMI, DECEASED.,**<br><br>       **Plaintiffs,**<br>  **vs.**<br><br>**COUNTY OF BUCKS, BRIAN KIRCHER, PATRICK ROONEY, STEVEN COLUMBIA, C.O. KNONEBORG, LANGSTON MASON, TIMOTHY RICCI, DAVID GRESKO, PRIMECARE MEDICAL, INC., ET AL.**<br><br>       **Defendants.** | **CIVIL ACTION**<br><br>**NO.  2:19-cv-02187-JS** |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Brief in Opposition to

Plaintiffs' Motion in Limine was electronically filed with the Clerk of Court on March 4, 2022,

using the CM/ECF system, and is available for viewing and downloading through the ECF

system by all counsel of record.

        Respectfully submitted,

         */s/ Kerri E. Chewning*
        Kerri E. Chewning, Esquire

        Archer & Greiner, P.C.
        Three Logan Square
        1717 Arch Street, Suite 3500
        Philadelphia, PA 19103-7393
        Telephone: (215) 963-3300
        Facsimile: (215) 963-9999

        *Attorney for Defendants*
        *County of Bucks, Kircher, Rooney, Columbia,*
        *Knoneborg, Mason, Ricci and Gresko*