IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID W.W. ADAMI, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | No. 19-2187 |
| | : | |
| COUNTY OF BUCKS, et al. | : | |

## MEMORANDUM

**Juan R. Sánchez, C.J.**                                                                **April 8, 2022**

This case arises from the tragic death of Plaintiff David W.W. Adami from opiate withdrawal. At the time of his death, Adami was in the Bucks County Correctional Facility ("BCCF") and had received treatment from PrimeCare Medical, Inc. ("PCM"). Adami died suddenly due to symptoms of withdrawal.  Defendants County of Bucks, Steven Columbia, David Gresko, Brian Kircher, Lisa Knoneborg, Langston Mason, Timothy Ricci and Patrick Rooney have moved for summary judgment. Because there is no genuine dispute as to material fact as to certain claims, the Motion will be granted with respect to Brian Kircher, Patrick Rooney, and Langston Mason. The Motion will be denied as to all other defendants.

## FACTS[1]

On January 27, 2018, at approximately 7:28 a.m., Adami was arrested for possession of drug paraphernalia and admitted to the BCCC. Defs.' SUMF ¶ 1, ECF No. 66-2. Approximately three hours later, at 10:35 a.m., Adami was medically screened by Nurse Samantha Dunfee, who was employed by PCM. *Id.* ¶ 2. Adami informed Nurse Dunfee that he had an opioid addiction, was previously using twenty bags of heroin a day, and was experiencing chills and vomiting due to

---

[1] The following facts are drawn from the documents in the summary judgment record. The facts are undisputed, except where specifically noted to the contrary.

withdrawal. Defs.' SUMF ¶ 3; Pl.'s SUMF ¶ 4. PCM, which was responsible for deciding whether an inmate was put on medical watch, placed Adami on regular medical watch for heroin withdrawal. Defs.' SUMF ¶¶ 4-5.

The County of Bucks's Watch and Observation Policy requires officers to perform rounds every 30 minutes to check on inmates, like Adami, who are placed on Level III Medical Watch. Pl.'s SUMF ¶¶ 17-19; Defs.' SUMF ¶¶ 17-19. The policy also has inmate workers (inmate monitors) perform checks on other inmates placed on Level III Medical Watch every fifteen minutes. Pl.'s SUMF ¶¶ 18, 20; Defs.' SUMF ¶¶ 18, 20. The inmate monitor who was supposed to check on Adami was Kevin Foster. Pl.'s SUMF ¶24. While the documentation from the Inmate Monitors indicates fifteen-minute checks were conducted, video footage implies at least some checks were not performed, and Foster was in his cell on a different floor for large portions of the night Adami died.[2] Pl.'s SUMF ¶ 24.

At 12:05 p.m., Adami was assigned to Housing Unit/Module A, Cell 5. Pl.'s SUMF ¶ 9. At 12:15 p.m., PCM Nurse Deborah Buckman entered a note on the record that Adami's intake was reviewed. Pl.'s SUMF ¶ 6.[3] No medication was ordered. *Id.* While Adami was traveling to Module A, Charmaine Henderson-Mitchell, a case worker, noted Adami reported "detoxing from heroin." Pl.'s SUMF ¶ 8. Adami arrived at Module A at 12:23 p.m. and was assigned to the bottom bunk. Defs.' SUMF ¶ 7. At 1:46 p.m., Dr. Gessner, who worked for PCM, prescribed Bentyl to be taken

---

[2] Defendants "denied" this fact in their Response to Plaintiff's Statement of Undisputed Facts, but did not provide any explanation, nor did they cite to the record. The record supports this assertion, and Adami is entitled to have facts construed in the light most favorable to him.

[3] The Moving Defendants deny this for lack of personal knowledge of the facts. Def's Resp. to Pl.'s SUMF ¶ 6. However, the record supports this assertion, and Adami is entitled to have facts construed in the light most favorable to him.

three times daily, Bismuth two times daily, Ondansetron three times daily, and Vistaril three times daily.[4] *See* Pl.'s SUMF ¶ 10; *see also* Defs.' SUMF ¶ 9.  Nurse Dunfee entered the order. *Id.*

At 2:28 p.m., Officer Patrick Rooney began his shift. *See* Defs.' SUMF ¶ 8.  Officer Brian Kircher also began his shift around 2:00 p.m. Defs.' SUMF ¶ 10. At 4:47 p.m., Bruce Gramiak was assigned to be Adami's cellmate. Defs. SUMF ¶ 11. Adami told Gramiak he was a heroin user, he was detoxing, and he was not feeling well. Defs.' SUMF ¶ 12. Around 6:00 p.m., Nurse Gabrielle Trusty saw Adami for a "Detox Check."[5]  Pl.'s SUMF ¶ 11. A few hours later, at 7:01 p.m., Adami walked without assistance to the medical cart, where he waited in line to receive his medication. Pl.'s SUMF ¶ 12; *see also* Defs.' SUMF ¶ 13. Just a few minutes later, at approximately 7:08 p.m., Officer Rooney and a PCM nurse conducted rounds. *Id.* ¶ 14. This was the last time Adami was seen by another medical provider until he was found unresponsive the next morning. Pl.'s SUMF ¶ 13.

During those rounds, Adami was not vomiting or using the toilet. Defs.' SUMF ¶ 17.[6] Gramiak told Nurse Aaron Wright and Officer Rooney that his cellmate was "really sick" and

---

[4] The Moving Defendants deny this as they do not have personal knowledge of the facts. Defs.' Resp. to Pl.'s SUMF ¶ 10.  However, the record supports this assertion, and Adami is entitled to have facts construed in the light most favorable to him.

[5] The Moving Defendants deny this as they do not have personal knowledge of the facts. Defs.' Resp. to Pl.'s SUMF ¶11.  However, the record supports this assertion, and Adami is entitled to have facts construed in the light most favorable to him.

[6] Adami states a general denial of Defendants summary of Gramiak's deposition testimony and incorporates their own Statement of Undisputed Fact's discussion of Gramiak's deposition. Pl.'s Resp. to Defs.' SUMF ¶¶ 15-24; Pl.'s SUMF ¶¶ 25-30. However, Adami's SUMF does not allege Adami was vomiting or using the toilet around 7:08 p.m. Pl.'s SUMF ¶¶ 25-30.

asked Nurse Wright if Adami was receiving the right medication." Pl.'s SUMF ¶¶ 28-29.[7]  Nurse Wright said he would double check. Defs.' Resp. to Pl.'s SUMF ¶ 28-29. Officer Rooney then closed and locked Adami's cell door. Pl.'s SUMF ¶ 29. After their conversation, Gramiak went to the dayroom area, and did not return to his cell until 8:45 p.m., when he saw Adami sleeping. At 9:37 p.m., Officer Rooney's shift ended. Defs.' SUMF ¶ 8.

Officer Columbia was assigned to Module A and began his shift at 10:06 p.m.[8] *See* Defs.' Ex. G ("Columbia Log Entries"). For inmates like Adami, who were on regular medical watch, Officer Columbia was required to observe the inmates every 30 minutes. Defs.' SUMF  ¶ 29. According to Officers Columbia and Knoneborg, if the officer performing the checks every 30 minutes cannot see an inmate, they need to turn a light on, or use a flashlight to see the inmate. Pl.'s SUMF ¶¶ 45, 48-49; Defs.' Resp. to Pl.'s SUMF ¶¶ 45, 48-49; Pl.'s Ex. 22, Columbia Dep. 31:24, 32:1-15. Officer Columbia performed twelve rounds during his shift but did not perform rounds every thirty minutes.[9] *Id.*  During at least some of the rounds, Officer Columbia walked quickly past each cell,

---

[7] Moving Defendants dispute whether or not Gramiak told Officer Rooney that his cellmate was "really sick." When asked if he spoke to both Officer Rooney and Nurse Wright at the same time, Gramiak replied "[w]ell, I was mainly speaking to the nurse because I wanted to make sure he got the right pills and stuff. But the CO was standing right beside the nurse at the time." Defs.' Resp. to Pl.'s SUMF ¶ 28-29, ECF No. 83. Given the proximity of Officer Rooney to Nurse Wright in the video, Gramiak's statement ("the CO was standing right beside the nurse"), and interpreting the facts in the light most favorable to Adami, it is a reasonable inference that Rooney heard Gramiak mention how sick Adami was.

[8] Moving Defendants' Statement of Material Undisputed Facts states Officer Columbia started his shift at 11:06 p.m. and cites to the Columbia Log entries. Defs.' SUMF ¶ 26. This is an incorrect conversion of military time, as the log book states officer Columbia began his shift on 1/27/2018 at 22:06—which is 10:06 p.m., not 11:06 p.m. *See* Defs.' Ex. G ("Columbia Log Entries").

[9] Officer Columbia and his relief performed checks at 10:28 p.m.; 11:05 p.m.; 11:36 p.m.; 12:29 a.m. (Knoneborg toured as relief); 1:01 a.m.; 1:30 a.m.; 1:56 a.m.; 2:29 a.m.; 2:59 a.m.; 3:29 a.m.; 4:04 a.m.; 4:31 a.m.; and 5:30 a.m. Moving Defendants assert that this was "every 30 minutes" but, based on the logs, there appears to be a gap of almost an hour, between 11:36 p.m. and when

and did not spend substantial time visualizing Adami or the other inmates.[10] Pl.'s SUMF ¶ 46; Pl.'s Exs. 24, 25, 26.

Around midnight on January 28, 2018,[11] Adami began to use the toilet intermittently to vomit and make bowel movements. Defs.' SUMF ¶ 21. Gramiak estimated that Adami vomited and defecated every fifteen to twenty minutes, and that the vomiting sounded like he was "dry-heaving a lot."[12] Pl.'s SUMF ¶ 31; s*ee also* Gramiak Dep. 30:1-24, 31:1-24, 32:1-24, 33:1-24, ECF. No. 70-4. Gramiak did not call for help, nor did he explicitly tell an officer that Adami needed medical attention. Defs.' SUMF ¶¶ 23-24.

At 2:59 a.m., Officer Columbia toured Module A. Officer Columbia was then relieved for his break by Officer Knoneborg at 3:02 a.m. Defs.' SUMF ¶¶ 34, 40. Shortly thereafter, at 3:10 a.m., Sergeant Mason, who was the only first shift supervisor assigned to the entire prison, arrived at Module A. Defs.' SUMF ¶¶ 35-37. The sergeant is required to do at least one tour of each module, visualizing every inmate, per shift and conduct an inspection at unspecified times. Pl.'s SUMF ¶

---

Knoneborg toured at 12:29 a.m. *See* Defs.' Ex. G ("Columbia Log Entries"). Viewing the facts in the light most favorable to Adami, the logbook shows that Officer Columbia's rounds were *not* conducted every thirty minutes or less. *Id.*

[10] Defendants deny this fact. Defs.' Resp. to Pl.'s SUMF ¶ 46. The Court has reviewed the videos, and the record supports this assertion. Adami is entitled to have facts construed in the light most favorable to him at the motion for summary judgment stage.

[11] The following paragraph discussing Mr. Gramiak's testimony was the source of extensive disagreement between the parties. Adami stated a general denial of Defendants' summary of Gramiak's deposition testimony and incorporated his own Statement of Undisputed Facts discussion of Gramiak's deposition to said objection. Pl.'s Resp. to Defs.' SUMF ¶¶ 15-24; Pl.'s SUMF ¶¶ 25-30.

[12] Defendants dispute that Adami was using the toilet "all through the night" and cite to Gramiak's deposition at "77 of 125 at lines 4-10." Defs.' Resp. to Pl.'s SUMF ¶ 31. The portion of the record cited contains a discussion of a prisoner who came in with Adami and spoke to Gramiak and does not support Defendants' assertion.

66. Sergeant Mason did not complete his round—instead, he viewed at most one or two inmates before he departed at 3:22 a.m. for a reason he could not recall. Defs.' SUMF ¶ 38; Pl.'s Resp. to Defs.' SUMF ¶ 38. However, "it was common that [Sergeant Mason] wouldn't get all of [his] tours done." Sergeant Mason Dep. 78:16-22, ECF No. 68-2; Pl.'s SUMF ¶ 70.  Nonetheless, Sergeant Mason was never explicitly informed by Adami that the withdrawal symptoms were worsening. Defs.' SUMF ¶ 39; Pl.'s Resp. to Defs.' SUMF ¶ 39.

Officer Columbia returned from his break at 3:22 a.m., and Officer Knoneborg left. Defs.' SUMF ¶ 41. Gramiak does not remember seeing any guard look in to check on Adami with a light to check during that night, but believes anyone coming to the window to check on Adami every 15 minutes would have at some point overlapped with Adami "getting up and getting sick and vomiting and defecating."[13] Pl.'s SUMF at 32-33. Gramiak Dep. 36:1-24, 37:1-24, ECF No. 70-4. Adami never explicitly told Officer Columbia that his withdrawal symptoms were getting worse or his medications were not working. Officer Columbia's shift ended at 5:43 a.m. Defs.' SUMF ¶ 27.

The next morning, on January 28th, 2018, Correctional Officers Ricci and Gresko reported to Module A at approximately 6:00 a.m. Defs.' SUMF ¶¶ 25, 42. Officer Ricci toured the Module at 6:06 a.m. and looked into Adami's cell from the outside. Defs.' SUMF ¶ 43. He saw Adami on his bed and did not find anything unusual about the way in which Adami was on the bed at the time. *Id.* Thirty minutes later, at 6:35 a.m., Officer Ricci conducted his second tour of Module A, and noticed Adami's position on the bed had changed and Adami's body seemed contorted. Defs.' SUMF ¶ 44. He yelled for his partner to call for emergency services, and additional guards and

---

[13] The Moving Defendants deny this as they do not have personal knowledge of the facts. Def's Resp. to Pl.'s SUMF ¶¶ 32-33.  However, the record supports this assertion, and Adami is entitled to have facts construed in the light most favorable to him.

medical staff arrived roughly two minutes later. Defs.' SUMF ¶¶ 45-46. The Emergency Medical Technicians arrived and transported Adami to Doylestown Hospital, where he was declared dead at 7:35 a.m. Defs.' SUMF ¶¶ 45-46. The autopsy conducted by the Bucks County Coroner, Dr. Ian Hood, concluded that the cause of death was "Sudden Death due to Opiate Withdrawal." Defs. SUMF ¶¶ 45-46.

**DISCUSSION**

A motion for summary judgment shall be granted "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation and internal quotation marks omitted). To defeat summary judgment, "the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the [non-movant]." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (alteration in original) (citation and internal quotation marks omitted). In evaluating a motion for summary judgment, a court must "view the facts in the light most favorable to the non-moving party and must make all reasonable inferences in that party's favor." *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

7

'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

The Moving Defendants argue (1) the Officer Defendants are entitled to qualified immunity because there was no violation of Adami's Fourteenth Amendment rights and the right at issue was not clearly established; and (2) Adami's municipal liability claim must be dismissed. The Court will address each in turn.

The determination of qualified immunity requires a two-step analysis. First, the Court must decide whether the alleged facts, construed in the light most favorable to the non-moving party, constitute a constitutional violation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). If this requirement is satisfied, the Court must then determine whether the right violated was "clearly established" at the time of the alleged misconduct. *Id.*

It is a violation of the Eight Amendment,[14] for a prison official to act with deliberate indifference to an inmate's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104-5 (1976). In order to survive summary judgment on a § 1983 deliberate indifference claim, a plaintiff must show "(1) plaintiff had a serious medical need," and "(2) the defendant was aware of this need and was deliberately indifferent to it." *Id.* at 450; *see also Farmer v. Brennan*, 511 U.S. 825 (1994). Because the Moving Defendants have conceded, for the purpose of the present Motion, that Adami had a serious medical need,[15] the first requirement is satisfied.

---

[14] Adami was a pretrial detainee at the time in question, so the § 1983 claim arises under the Due Process Clause of the Fourteenth Amendment. *See Colburn v. Upper Darby Twp.*, 838 F.2d 663 (3rd Cir. 1988). Fourteenth Amendment Due Process claims are evaluated using "the same standard used to evaluate similar claims brought under the Eighth Amendment." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581-82 (3d Cir. 2003).

[15] *See* Defs.' Mot. for Summ. J. at 5 n.3, ECF No. 66-1.

With regard to part two, there is a genuine dispute of fact regarding whether or not *some* of the Moving Defendants were deliberately indifferent to Adami's serious medical needs. Deliberate indifference is "something more than mere negligence, . . . [but is] satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). As a result, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk of inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

In the Third Circuit, deliberate indifference includes instances in which corrections officers (1) deny reasonable requests for medical treatment; (2) refuse to provide medical care while knowing it is needed; (3) delay necessary medical treatment for non-medical reasons; and (4) prevent an inmate from receiving recommended treatment for serious medical needs. *See Pearson v. Prison Health Serv.*, 850 F.3d 526, 538 (3d Cir. 2017).

However, as this Court stated previously, "non-medical prison officials cannot be deliberately indifferent "when the prisoner is under the care of medical experts and the official does not have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Adami v. County of Bucks*, No. 19-2187, 2020 WL 5849339, at *8 (E.D. Pa. Oct. 1, 2020) (quoting *Pearson*, 850 F.3d at 543). Additionally, there is no deliberate indifference if non-medical prison officials simply "failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993).

Moving Defendants allege Adami was under the continuing care of PMC and thus, "Plaintiffs improperly seek to hold correctional officers responsible for failing to second-guess the medical decisions of licensed health care providers employed by Defendant PrimeCare." Defs.' Rep. Brief 5, ECF No. 83. The Court will grant the motion for summary judgment with regard to Officers Kircher and Rooney on this basis.

There is no evidence in the record that Kircher knew or should have known Adami needed medical care. Adami *was* seen by nurses three times during Kircher's shift, including at 7:01 p.m., and was under PMC's continuing medical care until that point. Kircher was also not present for Gramiak's statement about his cellmate being "really sick" and, based on Gramiak's testimony, Adami did not begin vomiting and having bowel movements until after Kircher's shift was over. Without knowledge of Adami's worsening condition, and with Adami under the care of PCM, Kircher cannot be deliberately indifferent. The motion for summary judgment will therefore be granted as to Officer Kircher.

The same is true for Officer Rooney. Adami was under PMC's continuing medical care for the vast majority of Rooney's shift. Even assuming Officer Rooney overheard Gramiak say his cellmate was "really sick," Rooney would also have heard the nurse respond and agree to check on the medications. Furthermore, Rooney was not on duty at the time Gramiak alleges Adami's health deteriorated. Under *Pearson* and *Durmer*, Rooney is not required to second-guess the nurse's treatment decisions, especially when Adami's condition did not significantly change between 7:08 p.m. and the conclusion of Rooney's shift at 10:00 p.m. The motion for summary judgment will be granted as to Officer Rooney.

Officers Columbia, Gresko, Knoneborg, Mason, and Ricci however "were never put in a position where they had to second guess treatment decisions by medical personal." *Adami*, 2020

10

WL 5849339, at *9. Instead, Adami had three isolated interactions with PMC nurses: (1) when he was first seen by Nurse Dunfee at 10:35 a.m.; (2) at approximately 6:00 p.m. when Nurse Trusty checked his vitals; and (3) at 7:01 p.m. when Nurse Wright administered his medication. Adami never saw a physician, nor was he scheduled to see a Nurse from 8:00 p.m. to the time of his death eleven and a half hours later. Furthermore, per BCCF policy, the Officers were *required* to check on inmates on Medical Watch every thirty minutes. Based on these facts, at the summary judgment stage, it is reasonable to infer Adami was not "under the care" of PCM while he was in BCCF overnight. As a result, the Court must consider whether Officers Columbia, Gresko, Knoneborg, Mason, and Ricci were deliberately indifferent to Mr. Adami's serious medical need.

The Court will grant the motion for summary judgment with regard to Sergeant Mason. As this Court previously explained, Officer Mason "entered Module A for [a] one-off, isolated purpose[], and did not interact with or observe Adami." Adami has not disputed this statement, nor does the record support that Officer Mason was made aware of Adami's serious medical need during the twelve minutes he was at Module A. In fact, as Adami concedes, Officer Mason saw at most one or two inmates while he was at Module A. Since there is no dispute of fact regarding Officer Mason's knowledge of Adami's serious medical need, he cannot be deliberately indifferent. The motion for summary judgment will be granted for Sergeant Mason.

Moving Defendants claim Officer Knoneborg also did not interact with or observe Adami. However, the record shows Officer Knoneborg at the very least should have observed Adami when she "toured [the] module [and] observed all inmates" at 12:39 a.m.  Defs.' Ex. G, at 2 ("Columbia Rounds Log), ECF Doc. 68; Pl.'s Resp. to Defs.' SUMF ¶¶ 26-31 (which directed the court to Defs.' Ex. G). Knoneborg's tour was after Gramiak alleges Adami began vomiting and making bowel movements every fifteen minutes and, construing the facts in the light most favorable to

11

Adami, a reasonable jury could find Knoneborg knew Adami was sick and deteriorating, and Knoneborg was thus deliberately indifferent. As such, the motion for summary judgment will be denied with respect to Officer Knoneborg.

Similarly, Officers Columbia, Gresko and Ricci were all on shift in Module A after Gramiak alleges Adami began vomiting and making bowel movements every fifteen minutes. Construing the facts and Mr. Gramiak's testimony in the light most favorable to Adami, a reasonable jury could find Columbia, Gresko, and Ricci knew Adami was alarmingly sick, was on medical watch, and ignored a serious medical need. Thus, a reasonable jury could find Officers Columbia, Gresko and Ricci were deliberately indifferent. The motion for summary judgment will be denied with respect to Officers Columbia, Gresko, and Ricci.[16]

Having found that a reasonable jury could find an Eighth Amendment violation due to deliberate indifference to Adami's serious medical needs by the remaining officers, the existence of qualified immunity depends on the second prong—whether the right at issue was clearly established. *Id.* The Court finds it was.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Kane v. Barger*, 902 F.3d 185, 194 (3d Cir. 2018) (citations omitted). In order to determine if the "right at issue" was "clearly established" at the time of the alleged misconduct, the right at issue must be defined "at the appropriate level of specificity." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012). However, "it need not be the case that the exact conduct has previously been held unlawful so long as the

---

[16] As discussed above, Defendants dispute that Adami was using the toilet "all through the night" and cite to Gramiak's deposition at "77 of 125 at lines 4-10." Defs.' Resp. to Pl.'s SUMF ¶ 31. The portion of the record cited contains a discussion of a prisoner who came in with Adami and spoke to Gramiak. It does not support Defendants' assertion.

contours of the right are sufficiently clear." *Kedra v. Schroeter*, 876 F.3d 424, 450 (3d Cir. 2017);

*see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

In the present Motion, the Moving Defendants argue the Officer Defendants are entitled

to qualified immunity because the right at issue was not clearly established. This is incorrect. Here,

as in the motion to dismiss papers, the Moving Defendants define the right at stake far too

narrowly. Their proposed definition[17] is far narrower than the "appropriate level of specificity" the

Supreme Court emphasizes when cautioning against a "high level of generality." *See id*; *see also*

*Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).  Requiring the extreme level of specificity sought

by the Moving Defendants would essentially turn qualified immunity into absolute immunity.

Instead, the Court will define the right at issue as it did at the motion to dismiss stage, "whether

Adami had a clearly established right to adequate medical treatment for his withdrawal

symptoms—a serious medical need."[18] *Adami*, 2020 WL 5849339, at *11. He does.

As this Court explained previously, "[a]n inmate's right to treatment for a serious medical

need is beyond question." *Adami*, 2020 WL 5849339, at *11 (citing *Estelle v. Gamble*, 429 U.S.

97 (1976)); *see also Michtavi v. Scism*, 808 F.3d 203, 207 (3d Cir. 2015) (for the proposition that

---

[17] "[W]hether Adami had a clearly established right to medical monitoring by a correctional officer, when the correctional officer knew that Adami was diagnosed by a physician, provided medication, and was subject to ongoing medical treatment by the medical provider." Defs.' Mot. for Summ. J. 6, ECF No. 66-1.

[18] The Court acknowledges the Moving Defendants believe *Navolio v. Lawrence County* supports their case. 406 Fed. App'x 619 (3d Cir. 2011). However, the facts of *Navolio* were entirely different. Ms. Navolio did not die from withdrawal symptoms—instead, she died while under a withdrawal watch when, after retrieving her medication from the nurse, she either fell or jumped over the railing of the stairs and died as a result of the fall. The *Navolio* court found that vulnerability to a risk of suicide as a result of detoxification was not a recognized cause of action. That is fundamentally different than question at issue here, where the decedent died from withdrawal itself.

"the Court must consider whether existing precedent placed the statutory or constitutional question beyond debate").  For more than forty years under *Estelle*, it has been clear that a prison official violates the constitutional rights of an inmate by showing deliberate indifference to the inmate's existing serious medical need.[19] *Atkinson v. Taylor*, 316 F.3d 257, 266 (3d Cir. 2003). Despite Moving Defendants' attempt to relitigate the motion to dismiss, the Court's opinion has not changed. The alleged violation of Adami's constitutional rights was clearly established at the time of the alleged misconduct.

Because (1) a reasonable jury could find that the Remaining Officers acted with deliberate indifference, and thus could make out an Eight Amendment violation; and (2) the right at issue was clearly established at the time of the alleged misconduct, the remaining officers are not entitled to qualified immunity. The motion for summary judgment will consequently be denied with respect to the remaining officers.

Finally, the Court will deny the motion for summary judgment as to the *Monell* claims against Bucks County. To survive summary judgment, Adami must prove "a [local] government's policy or custom . . . inflict[ed] the injury in question." *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (alterations in original) (quoting *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978)).

A plaintiff can recover from a municipality under § 1983 by (1) identifying a policy or custom that deprived him of a federally protected right, (2) showing the municipality, by deliberate conduct, was the moving force behind the alleged deprivation, and (3) establishing a direct causal link between the custom or policy and the injury. *See Bd. of the County Commissioners v. Brown*,

---

[19] As stated above, the Moving Defendants have conceded for the purposes of this motion that Adami had a serious medical need.

520 U.S. 397, 404 (1997). "Policy is made when a decision maker possess[ing] final authority to

establish municipal policy with respect to the action issues an official proclamation, policy, or

edict." *Estate of Roman*, 914 F.3d 798 (3d Cir. 2019) (citations omitted).[20] A *Monell* claim is also

established "where the failure to train amounts to deliberate indifference to the rights of persons

with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 387-388 (1989).

Here, there are factual disputes regarding the quantity and quality of the training the

Officers received,[21] which could lead a reasonable jury to find that the County, through its policy,

was deliberately indifferent to the needs of prisoners going through opiate withdrawal. Adami

allege the officers (1) did not receive adequate training to monitor inmates going through

withdrawal and thus, (2) many did not consider vomiting worthy of reporting or were trained to

use their discretion.[22] Defendants disagree and assert correctional officers are trained "to call

---

[20] Of course, a finding of a constitutional violation is a prerequisite to finding a municipality liable for an injury under § 1983. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).  As detailed above, a reasonable jury could find that a state actor violated Adami's Fourteenth Amendment rights, so the direct claim does not fail as a matter of law.

[21] Since the motion must be dismissed on the basis of the failure to train the officers, the Court does not address the merits or lack thereof on the arguments regarding the use of inmate monitors.

[22]   Based on the record, a reasonable juror could find that the officers did not receive appropriate training, despite regularly interacting with individuals going through withdrawal. For example, Officer Columbia stated he did not recall what training he received regarding observing inmates going through withdrawal. Columbia Dep. 26:15-24, ECF No. 70-5. When asked if he recalled "receiving training at Bucks County to call medical if inmates are detoxing and experiencing symptoms, Officer Columbia stated, "it was based on the discretion with the severity they're going through," and reiterated that "you had to use discretion" and that "[the officers] were trained to call depending on their symptoms."  Columbia Dep. 27:1-24.
        When asked "what training he received with regard to inmates going through opiate detox or opiate withdrawal," Officer Rooney said he "could not remember anything specific." Rooney Dep. 18:8-12, ECF No. 70-5. When asked who taught his training with regard to drug withdrawal, Officer Rooney recalled that the academy instructions were Lieutenant Mannarino and Lieutenant Lall. Rooney Dep. 18:13-23, ECF No. 70-5. Officer Rooney also said he could not recall having "any training on drug withdrawal provided by any medical personnel." Rooney Dep. 20:10-16, ECF No. 70-5.

medical if she/he observes an inmate under some form of medical distress regardless of a designated illness." Defs.' Mot. for Summ. J. 13, ECF No. 66-1 . Since Plaintiffs have provided sufficient evidence that a reasonable jury could find BCCF failed to train these officers, and that such a failure amounted to deliberate indifference, the motion for summary judgment will be denied with respect to Bucks County.

BY THE COURT:

 /s/ Juan R. Sánchez_____
Juan R. Sánchez, C.J.